May it please the court, my name is Dale Bache. I'm an assistant federal public defender with the Federal Defender of Arizona. I want to thank the court for making these arrangements today and the court staff. Also, I'm on week three of a cold, so this damp weather in D.C. is not helping, so please bear with me. Daniel Cook filed a complaint alleging an Eighth Amendment violation because the state of Arizona intends to use a non-FDA approved substance to execute him on April 5th. The question before the court is, did the district court err in dismissing Cook's complaint under Rule 12b-6? Well, Mr. Bache, isn't this case pretty well determined by, if not the letter of it, at least the spirit of the Landrigan case? No, Judge O'Scanlan. Landrigan was in a different procedural posture. Granted, we understand that. The rules for obtaining a preliminary injunction and the standards to get a stay are much higher than what is required under the liberal pleading standards of Civil Rule 8. All that Mr. Cook was required to do in filing his complaint was to allege enough facts to state a claim that's plausible on its face. In this case, then, if the substance is contaminated, not properly formulated, or is not what it's purported to be, then the intended use of this substance by defendants would be an Eighth Amendment violation. In other words, a court can draw a reasonable inference that defendants would be liable for obtaining and using this substance to execute Daniel Cook. Counsel, this is Judge Graber. Does it make any difference to the analysis or to our reaching the issues that you raise that Mr. Cook has the option to select a different method of execution as to which there is no alleged constitutional deficiency? No, Judge Graber, that does not factor into the equation. In fact, Mr. Cook has not elected a method of execution, and under Arizona law, the default method is lethal injection. Mr. Bache, this is Judge Callahan. Since we are dealing with the default method, he can change his mind up to, what is it, March 16th? Is that correct? I believe that's the date. All right. But the fact that he has not elected and, therefore, it goes to the default method, is that what makes this issue ripe for the court, or what's your analysis on that? This matter became ripe when the state sought a warrant of execution for Mr. Cook, and I believe that was probably seven months ago. The state sought a warrant, and the Arizona Supreme Court deferred in setting an execution date. So it's our position that once the state sought the warrant, this matter became ripe. If from now until March 16th, let's say if Mr. Cook were to select gas, then would that be the end of this lawsuit? Yes, this matter would be moot as to Mr. Cook. Okay, thank you. I'm sorry. Go ahead. Here, Mr. Cook alleged that non-FDA-approved drugs carried significant risks that the substance may not be effective, could be contaminated, or otherwise compromised. The problem I have with that assertion, Mr. Bashe, is that even if it's taken as true, I don't see how a claim for relief that is plausible has been made out. Is there any case that you can cite which holds that that simple allegation that you refer to, obviously this is 12b-6 context, is enough? Well, I would rely on Iqbal, Twombie, and Skinner, where all three cases said that all that the plaintiff has to allege is enough facts to raise a claim that's plausible. I guess in this context, the fact that the state is using these foreign drugs to carry out an execution would make them liable if those drugs turned out to be contaminated, compromised, or subpotent. But that's very speculative. And granted, the different context of Landrigan, the Supreme Court is pretty clear in telling us that there's no allegation that it was unlawfully obtained. There's no allegation that, in fact, its use will cause an injury. How can we get over that hurdle? Well, Judge O'Scanlan, at ER 22, paragraph 41, we allege that the drug was obtained in violation of federal law, specifically 21 U.S. Code 381, which says that non-FDA approved drugs shall not be imported into the United States. I thought there was evidence before the Arizona Supreme Court that there had been permission to import this substance in this instance. Well, that is beyond this record. But what the FDA did, as I understand it, was simply allow the drug in. That does not equate with approving the drug for use. 381 is pretty clear on that. And I refer the Court to, I think, footnote 2 in our opening brief, where we advise the Court that there's a separate lawsuit on this matter pending in the District of Columbia District Court. Mr. Bates, this is Judge Callahan. Would you agree that the sure or very likely to cause serious illness and needless suffering is the standard for considering Mr. Cook's Eighth Amendment claim regarding the use of sodium thiopental in his execution as articulated in Bayes v. Reese? Under Bayes, the standard is a substantial risk of serious pain. And it's our contention that if these drugs are contaminated or subpotent, that the use of these drugs will cause a substantial risk of serious pain during the execution. But you're back into speculation again, are you not, Mr. Bates? You are not alleging precisely what Judge Callahan set forth. Well, I refer the Court to in-ray Canadian import antitrust litigation that we cite in our brief, where the Court found that foreign manufactured drugs are produced in an environment where the drug may not be effective and could be contaminated. But is that sufficient under the Supreme Court's more recent cases that require something more than really essentially guesswork, because there could be hundreds of different drugs manufactured in hundreds of different countries, and to just have the generalization that there could be a problem. There seems to be no specific allegation that this specific substance is either ineffective or contaminated. Judge Graber, maybe to win the case, that may be true, but at this stage of the litigation, all we have to do is allege enough facts. But they have to be specific facts, so that's my concern. You have a general statement, which is probably true, which is that foreign manufactured drugs in general may carry a greater risk because we don't control their manufacture. But that's a far cry from actually suggesting that any particular item is contaminated or ineffective. At least it seems to me that there's a disconnect there without some more specific allegation. Well, one of the problems, Judge Graber, is that we don't have access to the information. The state has the labeling, the label inserts, information pertaining to the chain of custody, and the like. We've attempted to get that information from the state. We sent a letter in Landrigan back in September of 2010, and Mr. Cook sent a letter to the state in November of 2010 asking for specific information, and the state declined to provide it. If we're in a situation where the state holds all the information and doesn't disclose it, we may never be able to prove our case. So I think under Rule 8, again, we're alleging all that we know at this point. And, of course, the question then is, is that enough? And in our view, Judge O'Scanlan, it is. Again, this court must take as true the allegations that we made in our complaint. For instance, we allege that the Department of Correction lacks safeguards to ensure that the substance is not contaminated. We allege that it was obtained in violation of federal law. We allege that the drugs from foreign countries do not have the same safety assurances and may be counterfeit. And if the drugs are contaminated and compromised, and they're used, then the state would be violating the Eighth Amendment, and we would at least have an opportunity to try and meet our burden under Bays. Counsel, would this be an appropriate time for you to let us hear from the other side? You have plenty of reserved time, obviously, unless you want to proceed with any additional point at this time. My last point, Your Honor, is that under Skinner, Iqbal, and Twombly, we meet the requirements of Rule 8. We request an expedited decision by this court so that Mr. Cook may be allowed to pursue his claim in the district court. Thank you. Thank you, Counsel. We'll hear now from the state. May it please the Court, Counsel, Kent Katani representing defendants in this matter. Mr. Katani, what's your best argument? I'm sorry. I think Mr. Cook states that taking his five allegations is true. He has fulfilled his pleading requirements sufficient to survive a motion to dismiss. What, in your view, are the best examples of how Mr. Cook has failed to satisfy his pleading requirements? The claim is not plausible on its face. It has to do more than simply provide an unadorned, as Iqbal says, an unadorned defendant harmed me accusation. He has stated that there's a violation of federal law, and that assumes that the FDA regulates the importation of drugs to be used in an execution. The fact that there's a separate lawsuit suggests that the FDA has taken a position directly to the contrary. The FDA does not, and there's United States Supreme Court authority that we've cited in the brief where a petitioner was attempting to require the FDA to exercise jurisdiction over drugs for use in execution. The FDA declined to do so, and the United States Supreme Court said that it would not interfere with that decision. Regardless of whether, I'm sorry, go ahead. What should the panel make of Mr. Cook's assertions that he has discovered evidence that there were procedural irregularities in the Landrigan execution, and there were problems with the use of sodium thiopental in other executions? The first time that has been raised is in the reply brief, and the allegation in the reply brief is that 10 grams of sodium thiopental were used rather than 5. I have the document that was provided to Mr. Bache, and the document simply says that 10 grams of, Dale, I'm referring to the special operations checklist. It says that 8 syringes filled with 1.25 grams each of sodium pentothal and sterile water, and then it just says process takes 3 minutes. The protocol requires a backup. There are only 4 syringes that are used in the execution. What they've alleged here is, based on this document that was, again, just referenced for the first time in the reply, is that 10 grams were used. The document just says that 8 syringes were filled with a total of 10 grams. That's required under the protocol. The protocol only requires the use of 4 of the syringes and 5 grams. And even were we to assume that they used 10 grams, that would still not create a colorable claim, that using more of the drug simply increases the likelihood that someone will be rendered unconscious. So even assuming, which these documents do not demonstrate, but even assuming they were to suggest that 10 grams were used rather than 5 that's required under the protocol, that would not establish a violation. The protocol that was upheld in Kentucky requires, my reflection is it requires 3 grams. Arizona uses 5 grams, which simply provides greater protection. But using more, so that's the assertion that's been made regarding the Landrigan execution. And Mr. Cook's current attorneys, Mr. Bache, represented Mr. Landrigan and was present at the execution. And there's no affidavits or any suggestion that anything went wrong. The only thing they've now alleged is there were 10 grams of sodium thiopental that were used. And that simply doesn't tell us that anything went wrong. Counsel, I have a question going back to the FDA approval issue. Regardless of whether FDA approval is in fact required, may or may not be relevant to the following question. Because the allegation in the complaint is that a foreign manufactured substance that does not undergo FDA approval, leaving aside whether it's required, simply factually if it doesn't do that, such a substance has a risk of being counterfeit, a risk of being ineffective, or a risk of being contaminated. Which is factual and not a legal question as to whether FDA approval is required. Why isn't that allegation sufficient just at the pleading stage? We're not dealing yet with proof one way or the other. Well, I agree with Judge Kozinski's statement in the opinion dissenting from the granting of en banc review, in which he indicated it would be unwarranted to give primacy to a distinction between drugs manufactured by a domestic company and drugs manufactured in a foreign country. This is a drug that's used worldwide. This drug was apparently manufactured in Europe. But you're now talking about the merits now, and this is a pleading case. And so what you're saying is we will win because they can't prove the allegation that there's an acceptable risk. And I guess I'm concerned about the blurring between the pleading standard for specificity and the fact that you might very well win. What I'm suggesting is that it's still not plausible on its face. There's no affidavit, for example, that drugs obtained from a manufacturer in England would be substandard. We could make the same argument a drug was manufactured in California rather than Nevada, and someone can allege California has better facilities than Nevada. It's so speculative that it does not rise to the level that it states a plausible claim on its face. What if it said that it was manufactured in someone's garage in Guatemala? Would you have the same view of the pleadings? Well, I think it's a more difficult argument for them to make, given that this drug, this very drug comes from this. That's not my question. That wasn't my question. I'm talking about the sufficiency of the pleadings, not, again, whether that's provable, but whether it's sufficient on its face. Well, I think that comes closer to being plausible or a plausible claim. But when you've had this drug has been used in the Landrigan execution, drugs from this same manufacturer, and they were used without incident, from my perspective, that creates a very high hurdle for them to overcome. We've used this. We have it. It's here from this same source, and that there's no indication whatsoever that it didn't do what it's intended to do. And in terms of the posture that- When you talk about Landrigan and Hammond, they dealt with prisoners seeking a stay of execution. How do you, how would you argue they're relevant to our decision here? I think the spirit of Landrigan does suggest that it's- He hasn't even come close to stating a claim. And I would point out that we are in essentially the same posture. I realize this is in the context of a motion to dismiss or a failure to state a claim, but keep in mind that Landrigan did not file this complaint until the state had already filed a motion for an execution warrant. You said Landrigan. Do you mean Cook? I'm sorry, Cook. The state had already sought an execution warrant before Cook filed this, and Cook had an opportunity to litigate, and in fact litigated in state court, issues relating to the state's execution protocol. He chose to only argue violations of the Arizona Constitution, but his case was affirmed in 2009, and he's had over a year to litigate. And the protocol does not require FDA-approved drugs. So he's certainly been on notice of the protocol. It's something that could have been litigated as part of his state court litigation. He was well aware of the Dickens litigation that his own attorneys were assisting with, and the Dickens litigation went through an exhaustive discovery. The issue was not raised. So we are in the posture of, to the extent relief is going to be granted, the only way it will have any meaning is if an injunctive relief is granted. An execution date has been set for April 5th, so at this point he's really not in a very much different posture than Landrigan was. But I think the salient point is simply that what we see from Landrigan is that he didn't come close to establishing a claim. It wasn't, gee, this is a close question, and he hasn't stated a plausible claim. And I think under the standard for a Rule 12b-6 motion, that's sufficient to grant the motion. What's your position on what I brought up with Mr. Vaish about rightness? What's your position on that issue? Well, I think the position we took in Dickens is that it's a viable Section 1983 claim that can be pursued by a prisoner, claims relating to the state's lethal injection protocol. So I don't know that rightness is necessarily a question here. We certainly didn't raise it as an issue. We agreed to go forward with the Dickens litigation to try to resolve it and address whatever issues there might be with Arizona's lethal execution protocol, even though those were all inmates who were obviously, and we highlighted the fact that the discovery could take place in that context. None of those inmates were under a warrant. As long as Mr. Cook has not elected the default protocol is what is his method of execution. So that's why it's right. I believe it is right because it's a 1983 claim, because he could make that choice, and he's entitled to. Certainly we would not have objected, and we did not object in Dickens on the basis of rightness to the inmates raising the challenge to Arizona's lethal injection protocol. Is there a reason to wait until after March 16th before we decide this? I mean, he could change his mind, right? Certainly if he changes his mind. From my perspective, because he hasn't stated a claim that's plausible on its face, I think the rationale that's set forth in Landergan, including in Judge Kaczynski's opinion, I think dictates the result that this claim was properly rejected, that the district court properly granted the state's motion to dismiss. Thank you. Anything further? And if the court doesn't have any further questions, I would ask that this court uphold the ruling of the district court granting the state's motion to dismiss. Thank you. Thank you, Mr. Conning. Mr. Bates, you have quite a lot of reserve time. Thank you, Your Honor. A few quick points. The defendants bring up the documents that were recently released in Landergan and attempt to explain what was meant by those documents. Those documents are unclear and raise a number of questions. As far as witnessing Landergan's execution, Mr. Catani is correct. I did witness his execution. Mr. Landergan's eyes remained open during the execution, just as Mr. Hammond's and Mr. Rhodes' eyes were open. I have filed a declaration stating that in a matter pending in Georgia. I think this will address the point that Judge Graber raised. The Eighth Circuit in in-ray Canadian antitrust litigation held that drugs from foreign countries do not have the same safety assurances. So a court has already found that foreign drugs are not the same as FDA-approved drugs. I want to correct a statement made by the defendants. The drugs at issue here were not manufactured in England. The drugs were manufactured in Austria by a German-owned company named Sandos, sold to a British pharmaceutical firm, and then sent to a wholesaler. This whole issue about the foreign drugs only came to light in October of 2010. That is when the state finally disclosed, after our requests over a two-month period for information about the drugs, only in October of 2010 did they disclose that the drug was not a domestically produced drug. So the statement that Mr. Cook could have raised this claim in prior litigation or earlier is not true. And finally, the state says that we're going to be in the same posture as Landrigan because we're less than a month away from the execution. Let's remember, we were diligent here. We filed this complaint in October of 2010. And this litigation could have been expedited in the district court so we wouldn't be in this eleventh-hour posture. Finally, if this court does send the matter back to the district court, we will ask the Arizona Supreme Court to issue a stay so that the litigation may proceed. Thank you. Counsel, I have a question. Counsel, you heard the colloquy with respect to whether we should wait until after March 16th, which is the deadline for the optional choice. Two questions. Number one, do you have any position with respect to what your client is going to do on that subject? And then number two, is there any merit from your point of view in waiting until after the 16th to decide the case? I have no indication from Mr. Cook that he is interested in choosing gas as a method of execution. And we would request that the court decide this matter as expeditiously as possible. Very well. Anything further? Anything further, Mr. Bage? No, Your Honor. Thank you very much and thank you for accommodating me today. Very well, Mr. Bage. The case just argued will be submitted for decision and the court will adjourn. All rise. Hear ye, hear ye all persons having had business with the Honorable United States Court of Appeals for the Ninth Circuit will now depart for this court for this session now stands adjourned.
judges: O'scannlain, Graber, Callahan